Harold R. CRANSTON, Dale R. French, Helmer A. Carlson and David B. Phillips, Individually and on Behalf of all Other Persons in their Class who are Similarly Situated and Affected, Plaintiffs,

v.

Orville L. FREEMAN, Secretary of Agriculture of the United States, Defendant,

and

Albert Guilian, Grover C. Atwood, and A. J. Malnati, Individually and on Behalf of all Other Persons in their Class who are Similarly Situated and Affected, Defendant-Interveners.

Civ. A. No. 67–CV–38.

United States District Court
N. D. New York.

Aug. 2, 1968.

John P. Weatherwax, Troy, N. Y. (James M. Strang, Troy, N. Y., of counsel), for plaintiffs.

J. C. Krausè and John G. Liebert, Attys., Dept. of Agriculture, Washington, D. C., Jane M. Friedman, Irwin Goldbloom, Harland F. Leathers, Attys., Dept. of Justice, Washington, D. C., Justin J. Mahoney, U. S. Atty., and Frank A. Dziduch, Asst. U. S. Atty., Albany, N. Y., for defendant Freeman.

Frederick U. Conard, Jr., Don C. Polley, and Theodore Space, of Shipman & Goodwin, Hartford, Conn., for defendant-interveners.

## MEMORANDUM OF DECISION AFTER TRIAL

TIMBERS, District Judge.*

### QUESTION PRESENTED

This action was brought by six dairy farmers residing in Rensselaer County,

* Chief Judge of the District of Connecticut, sitting by designation.

New York, suing for themselves individually and on behalf of all other persons in their class similarly situated and affected.[1] They seek declaratory and injunctive relief against the Secretary of Agriculture. Three other dairy farmers residing in Litchfield County, Connecticut, and Berkshire County, Massachusetts, for themselves individually and on behalf of all other persons in their class similarly situated and affected, were permitted to intervene as defendants. The essential questions presented are: (1) whether the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601, et seq., authorizes the Secretary of Agriculture to include in the Connecticut Milk Marketing Order, 7 C.F.R. § 1015, et seq. (1968), certain farm location differentials, 7 C.F.R. § 1015.72 (1968), which have been in effect since 1959; (2) whether the farm location differentials are unconstitutionally discriminatory; and (3) whether there is substantial evidence in the administrative record to support the Secretary's inclusion of these differentials in the Connecticut Milk Marketing Order.

After an eleven day trial at Albany, the Court holds that the Act does authorize the farm location differentials; that such differentials are not unconstitutionally discriminatory; and that there is substantial evidence in the administrative record to justify inclusion of these differentials in the Connecticut Milk Marketing Order. Accordingly, a permanent injunction enjoining the Secretary of Agriculture from administering the Connecticut Milk Marketing Order in such a way as to give effect to the farm location differentials is denied.

## JURISDICTION AND VENUE

Jurisdiction is founded upon 28 U.S.C. § 1331(a), 28 U.S.C. § 1337, 28 U.S.C. §§ 2201–02, 5 U.S.C. §§ 701–06 and 7 U.S.C. § 601, et seq.

Venue is properly laid in this District pursuant to 28 U.S.C. § 1391(e).

## PROPRIETY OF CLASS ACTION AND CLASS ACTION DEFENSE; ADVERSARY NATURE OF PROCEEDINGS

Pursuant to Rule 23(c)(1), Fed.R. Civ.P., the Court on October 20, 1967, after hearing evidence, entered two orders: one permitting the named plaintiffs to maintain the instant action as a class action and the other permitting the named defendant-interveners to maintain a class action defense.

With respect to the named plaintiffs, the Court determined, pursuant to Rule 23(a) and (b)(1)(B), Fed.R.Civ.P., that they may properly represent the interests of those producers producing milk on their respective farms and selling such milk to handlers operating under the order regulating the handling of milk in the Connecticut marketing area, 7 C.F.R. § 1015, et seq. (1968), where the farms of such producers are located *outside* the area described in 7 C.F.R. § 1015.72(a) (1968) (in short, those who do *not* qualify for the 46¢ differential).

With respect to the three named defendant-interveners, the Court likewise determined, pursuant to Rule 23(a) and (b)(1)(B), Fed.R.Civ.P., that they may properly represent the interests of those producers producing milk on their respective farms and selling such milk to handlers operating under the order regulating the handling of milk in the Connecticut marketing area, 7 C.F.R. § 1015, et seq. (1968), where the farms of such producers are located *within* the area described in 7 C.F.R. § 1015.72(a) (1968) (in short, those who *do* qualify for the 46¢ differential).

In view of the recent decision of the United States Court of Appeals for this Circuit in Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2 Cir. 1968), the Court on April 22, 1968 directed that all members of plaintiffs' and defendant-interveners' classes be given formal notice of the pendency of the action and an opportunity

---

1. Since commencement of the action, Roy E. Ottman and George Mesick, Jr., two of the six persons who originally brought the action, have sought leave to withdraw as plaintiffs.

to be heard with respect to the continued maintenance of the action as a class action. The notices were sent by April 24, 1968 and made returnable on May 15, 1968.

Prior to the Court's order of April 22, 1968, Kenneth Hewitt and Leonard Duncan, members of plaintiffs' class, filed two papers entitled "Motion For Leave To Intervene Under Rule 24 or to Otherwise Enter Action Under Rule 23 for Purpose of Taking Depositions, to Move Dismissal of Suit and for Other Related Relief," and "Answer of Interveners and Motion to Dismiss Action, for Disposition of Escrow Fund and Other Relief." Since these papers made allegations of collusion which if true would not only have merited reversal of the class action orders but dismissal of the action, a hearing was similarly directed on May 15, 1968.

The Court thereafter held exhaustive hearings on May 15, May 27, and June 10, 1968, at which hearings all questions relating to the propriety of the maintenance of this action as a class action and all questions relating to Hewitt's and Duncan's claim of collusion were explored. Every interested person was given an opportunity to be heard and to present evidence through the testimony of witnesses and by means of exhibits. The complete record of all prior proceedings in this case was available for inspection by all interested persons at the Albany seat of Court from May 9, 1968.[2]

The evidence presented not only does not in any way justify dismissal of the action but it clearly merits reaffirmation of the Court's orders of October 20, 1967 permitting plaintiffs and defendant-interveners to maintain this action as a class action pursuant to Rule 23(a) and (b)(1)(B), Fed.R.Civ.P. Plaintiffs' class of approximately 250 persons and defendant-interveners' class of approximately 3000 are without any doubt "so numerous that joinder of all members is impracticable." No one has disputed, nor can anyone dispute, that there are questions of both law and fact common to the classes and that the claims of plaintiffs and defenses of defendant-interveners are typical of the claims and defenses of their classes. Furthermore, as a practical matter, the adjudication of the differentials' validity with respect to individual members of the classes would be dispositive as to all class members because the differentials cannot be enforced or withdrawn piecemeal.

The only issue which merits discussion is the charge of collusion raised by Hewitt and Duncan. Also involved here is the issue of fairness and adequacy of representation with respect to plaintiffs' maintenance of this action as a class action. Basically, Hewitt and Duncan claim that the Consolidated Milk Producers' Association (CMPA), formerly the Connecticut Milk Producers' Association, solicited plaintiffs to bring this action in the Northern District of New York, and through payment of plaintiffs' counsel fees and other means have acted to control this action for the benefit of defendant-interveners' class who constitute the majority of the Association's members.

There is no question about the fact that CMPA as an organization is interested in the continuation of farm location differentials. The vast majority of its members receive these differentials and feel that it will be to their benefit to continue to receive them. Defendant-interveners are members of CMPA and their

2. The Court's order of April 22, 1968 provided for the immediate availability of the record at the Albany seat of Court. At the time the order was entered, the undersigned was sitting by designation in the Southern District of New York, while the record was located at Bridgeport, Connecticut, the undersigned's official station. It was not until May 6, 1968, when the undersigned's assignment in the Southern District of New York was completed, that the undersigned was able to return to Bridgeport to pack the record, comprising numerous cartons, for shipment to Albany. The undersigned, however, is completely satisfied that all who desired to examine the record were aware of its availability after May 9, 1968 and had ample opportunity to study it. No prejudice resulted from the delay.

counsel also serves as counsel to CMPA. Furthermore, CMPA readily admits that after the farm location differentials in the neighboring New York-New Jersey Milk Marketing Order were held invalid by the Court of Appeals for the District of Columbia in 1966, the Association was troubled by the consequential uncertainty surrounding the validity of the Connecticut differentials. Part of this concern derived from the fact that a minority of its members, including all the named plaintiffs, did not receive the differentials and had vocally expressed their unhappiness with the situation. In fact, as established by the credible evidence, plaintiff Cranston had discussed the institution of a legal action to challenge the differentials with his long-time friend and neighbor, Attorney John P. Weatherwax, both before and after the decision in the District of Columbia.

It was only after Attorney Weatherwax had agreed to institute such an action challenging the differentials, that Cranston was contacted on January 27, 1967 by a CMPA official who had heard rumors that Cranston and others intended to commence a suit. This contact was the result of a decision on January 25, 1968 by CMPA to aid any members undertaking either to challenge or defend the differentials by reimbursing such members for reasonable expenses and attorney fees. The CMPA official explained the policy and mentioned the name of a possible attorney, but Cranston said that he already had his own. The official told Cranston that he would like to check on his reputation and see what kind of an attorney he was and if he was capable, because the Association was concerned about having good attorneys on both sides of the question. Aside from the offer to reimburse for reasonable expenses and this conversation, there was a subsequent meeting between CMPA officials, plaintiffs and Attorney Weatherwax. There is nothing, however, to suggest that CMPA in any way acted improperly. But most importantly, there is not an iota of credible evidence that CMPA, defendant-interveners, or defendant, acted, attempted to act, or even desired to act, to control plaintiffs' conduct in these proceedings. On the contrary, the record clearly demonstrates that plaintiffs for a number of years have been keenly interested in the abolition of the differentials, that they are just as keenly interested at this time, and that their counsel, Attorney Weatherwax, at all times has conscientiously, expertly and with the highest professional sense of duty to plaintiffs endeavored to represent their interests. Attorney Weatherwax has forthrightly, earnestly, and unceasingly prosecuted this lawsuit to enjoin the application of the differentials. He has conducted his case as any gentleman and lawyer should and would and has never conceded a point nor failed to present a plausible argument.

▇ The Court is fully cognizant that the payment by one side in an action of an opposing counsel's legal fees is a red flag as to collusion. See United States v. Johnson, 319 U.S. 302 (1943). But in the instant situation, the Association is in a unique position—it is a democratic institution composed of members on both sides of the question and it is duty-bound to serve the interests of all its members. Certainly under these circumstances, the Association's offer to reimburse any of its members for expenses does not give rise to collusion per se. Rather, the question must be whether the Association has in any way acted to control plaintiffs' conduct of the law suit. Cf. San Francisco v. Boyd, 22 Cal.2d 685, 140 P.2d 666 (1943). If the Court thought that there was even the slightest attempt to exert such control, it would not only reverse its class action orders but it would dismiss the entire action. The Court, however, is thoroughly convinced that no such attempt was made, that the proceedings have been of an adversary nature on the highest level, and that plaintiffs have fairly and more than adequately represented the other members of their class. The Court therefore not only refuses to dismiss this action but

reaffirms its decision to permit it to proceed as a class action.[3]

## THE AGRICULTURAL MARKETING AGREEMENT ACT OF 1937 AND THE CONNECTICUT MILK MARKETING ORDER

The Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601 et seq., confers upon the Secretary of Agriculture the power to regulate the price and marketing of milk and milk products, as well as various other agricultural commodities. With respect to the milk industry, the Act represents the ultimate attempt by Congress to deal with a "nation-wide distress of milk farmers, a distress which had culminated in a milk farmers' 'strike'—accompanied by violence and constituting an incipient agrarian revolution—that threatened to cut off a vital part of the nation's food supply." Queensboro Farms Products v. Wickard, 137 F.2d 969, 974 (2 Cir. 1943) (Frank, J.).

The basic factors giving rise to what Judge Frank described as the "exquisitely complicated 'milk problem'" were set forth by the Supreme Court in United States v. Rock Royal Co-operative, Inc., 307 U.S. 533, 549–50 (1939):

"It is generally recognized that the chief cause of fluctuating prices and supplies is the existence of a normal surplus which is necessary to furnish an adequate amount for peak periods of consumption. This results in an excess of production during the troughs of demand. As milk is highly perishable, a fertile field for the growth of bacteria, and yet an essential item of diet, it is most desirable to have an adequate production under close sanitary supervision to meet the constantly varying needs. * * * Since all milk produced cannot find a ready market as fluid milk in flush periods, the surplus must move into cream, butter, cheese, milk powder and other more or less nonperishable products. Since these manufactures are in competition with all similar dairy products, the prices for the milk absorbed into manufacturing processes must necessarily meet the competition of low-cost production areas far removed from the metropolitan centers. The market for fluid milk for use as a food beverage is the most profitable to the producer. Consequently, all producers strive for the fluid milk market."

The first far-reaching Congressional attempt to meet the problem was the Agricultural Adjustment Act of 1933. That Act provided for marketing agreements and authorized the Secretary of Agriculture to issue "licenses" for the regulation of agricultural commodities, including milk and milk products. In 1935, this Act was amended, partly in order to meet the delegation problems raised by the Supreme Court's decision in A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935). These amendments subsequently were reaffirmed and reenacted by Congress in the Agricultural Marketing Agreement Act of 1937 (the Act), and, as such, represent the legislative scheme extant today and that involved in this litigation.

In order to achieve such orderly marketing conditions as will establish "parity" prices for the dairy farmer and a level and sufficient flow of milk to the market (Section 2 of the Act, 7 U.S.C. § 602), the Act authorizes the Secretary of Agriculture to issue milk marketing orders for the various sections of the

---

**3.** Three members of plaintiffs' class have asked to be excluded therefrom and plaintiffs' counsel has asked the Court to grant this request. The action, however, is a class action pursuant to Rule 23(b)(1)(B), Fed.R.Civ.P., and, unlike a class action pursuant to Rule 23(b)(3), an otherwise proper member of the class cannot be excluded simply because he expresses such a desire.

The Court, however, does modify its order of October 20, 1967 with respect to the maintenance of this action as a class action by plaintiffs to the extent of eliminating as named plaintiffs, Roy E. Ottman and George E. Mesick, Jr., who have signified their desire to withdraw as plaintiffs.

country and specifies the terms and conditions which may be included in such orders.[4]

Section 8c(5)(A) of the Act, 7 U.S.C. § 608c(5)(A), provides for the classification of milk by each order according to milk's various uses, and for the establishment of a minimum price for each category. Thus, under the Connecticut Milk Marketing Order, which is involved in this litigation and which regulates all milk marketed in Connecticut whether produced in the state or shipped into the state from elsewhere, there are two general categories. 7 C.F.R. §§ 1015.51 and 1015.52 (1968). One category consists essentially of fluid milk used for beverage purposes, while the other consists primarily of milk used for nonfluid purposes. The minimum price for the category of milk used for fluid purposes is the higher to reflect the desirable position of such milk in the marketplace. 7 C.F.R. § 1015.60 (1968). When the "handler", the party who first purchases the farmer's milk either directly or through a marketing cooperative, disposes of milk, he ultimately becomes obligated for the minimum price associated with the use to which that particular milk is put.

Section 8c(5)(B) of the Act, 7 U.S.C. § 608c(5)(B), provides, however, that the individual farmer is not to receive payment according to the use of his particular milk. Instead, he is to be paid a uniform price determined either on the basis of the total obligations of the handler to which he delivers his milk or on the basis of the total or pooled obligations

4. Section 8c(5) of the Act, 7 U.S.C. § 608c(5), governing the issuance of milk marketing orders, provides in relevant part as follows:

"In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7) of this section) no others:

(A) Classifying milk in accordance with the form in which or the purpose for which it is used, and fixing, or providing a method for fixing, minimum prices for each such use classification which all handlers shall pay, and the time when payments shall be made, for milk purchased from producers or associations of producers. Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers.

(B) Providing:

(i) for the payment to all producers and associations of producers delivering milk to the same handler of uniform prices for all milk delivered by them * * *; or

(ii) for the payment to all producers and associations of producers delivering milk to all handlers of uniform prices for all milk so delivered, irrespective of the uses made of such milk by the individual handler to whom it is delivered;

subject, in either case, only to adjustments for (a) volume, market, and production differentials customarily applied by the handlers subject to such order, (b) the grade or quality of the milk delivered, (c) the locations at which delivery of such milk is made, and (d) a further adjustment, equitably to apportion the total value of the milk purchased by any handler, or by all handlers, among producers and associations of producers, on the basis of their marketings of milk during a representative period of time.

(C) In order to accomplish the purposes set forth in paragraphs (A) and (B) of this subsection, providing a method for making adjustments in payments, as among handlers (including producers who are also handlers), to the end that the total sums paid by each handler shall equal the value of the milk purchased by him at the prices fixed in accordance with paragraph (A) of this subsection.

* * * * *

(G) No marketing agreement or order applicable to milk and its products in any marketing area shall prohibit or in any manner limit, in the case of the products of milk, the marketing in that area of any milk or product thereof produced in any production area in the United States."

(The 1965 amendment to Section 8c(5) (B) does not affect the instant case.)

of all the handlers covered by an order. Under the Connecticut Order, the uniform, or blend, price is determined under the latter alternative. 7 C.F.R. § 1015.64 (1968). Thus, each handler pays this blend price, adjusted for certain factors to be discussed subsequently, to the farmers or cooperatives from whom he makes his purchases. By paying a farmer according to the marketwide utilization of milk rather than according to the utilization of his particular milk, competition among farmers to sell their milk for fluid use is eliminated.

Since the amount for which a handler becomes obligated is determined on the basis of the use of only the milk he handles, and the amount due his farmers is determined by the use of all the milk covered by the Order, Section 8c(5)(C), 7 U.S.C. § 608c(5)(C), permits resort to a "producer settlement fund" to bring the two amounts into balance. If in any month the utilization value of a handler's milk exceeds the blend price value, the handler must pay the difference into the fund. On the other hand, if the utilization value is less than the blend price value, the handler withdraws the difference from the fund. See 7 C.F.R. §§ 1015.80–.82 (1968).

As noted above, the uniform price otherwise payable to each farmer is subject to certain adjustments. Section 8c (5) (B), 7 U.S.C. § 608c(5) (B), specifically authorizes adjustment for "volume, market and production differentials customarily applied by the handlers subject to [the] order" and adjustments for "the grade or quality of the milk delivered" and "the locations at which delivery of such milk is made."

The Connecticut Milk Marketing Order contains three principal adjustments to the uniform price payable to dairy farmers. Section 1015.71 of the Order, 7 C.F.R. § 1015.71 (1968), provides for a "butterfat differential". Under it a farmer receives either more or less than the uniform price according to whether and by how much the butterfat content of his milk exceeds or falls below a standard level. This differential clearly is re-lated to the grade or quality of the milk and therefore unquestionably is authorized by the Act. It is not challenged here.

Section 1015.62 of the Order, 7 C.F.R. § 1015.62 (1968), providing for "plant zone differentials", also is unchallenged. Under this section a farmer receives a lesser price as the distance from Hartford of the handler's plant receiving the farmer's milk increases. The section, however, treats all plants in Connecticut, irrespective of their distance from Hartford, and those plants in Rhode Island and Massachusetts which are not more than fifty miles from Hartford, as if they were in Hartford. The result is that only those producers who deliver their milk to plants outside of this wide area receive a price which decreases as the actual road mileage from Hartford increases. Essentially, the purpose of the differential is to reflect in the price received by the farmer the added cost to the handler of moving the milk from the more distant receiving plants into the marketing area for distribution. Such a differential clearly is authorized as an adjustment according to "the locations at which delivery of such milk is made."

The third differential, referred to in the plural as "farm location differentials" because it consists of two parts, is found in Section 1015.72 of the Order, 7 C.F.R. § 1015.72 (1968). It is the validity of this provision which plaintiffs attack. Section 1015.72 provides:

"(a) In making payments to producers for milk received from a farm located in Connecticut, Rhode Island, in that portion of New York State east of the Hudson River and south of the Berkshire Section of the New York State Thruway, or in that portion of Massachusetts south of the Massachusetts Turnpike, there shall be added 46 cents per hundredweight.

(b) In making payments to producers for milk received from a farm located outside the area described in paragraph (a) of this section, but within that portion of New York State east of the Hudson River and south of the

northern boundaries of North Green-bush, Sand Lake, and Stephentown townships in Rensselaer County, and within that portion of Berkshire County, Massachusetts north of the Massachusetts Turnpike, there shall be added 23 cents per hundredweight.

(c) The uniform price for pool milk other than producer milk shall be subject to the applicable differentials for milk received from farms located in the areas set forth in paragraphs (a) and (b) of this section. * * *"

■ What this means essentially is that farmers selling milk under the Connecticut Order, whose farms are located in Connecticut, Rhode Island and certain neighboring sections of New York and Massachusetts, receive either 46 or 23 cents more per hundredweight for their milk than other farmers whose farms are located outside of this area but who still market their milk in Connecticut. The obligations of the handlers are not increased to provide for payment of these differentials. Rather, the uniform blended price is decreased so that the total or pooled obligation of all the handlers will be sufficient to cover payment of both the uniform blend price to all farmers under the Order and the additional 46 and 23 cents per hundredweight payable to those designated under this section. Therefore, since the provision results in a lower uniform blend price, those who receive only this price and no differential have standing to attack the provision. Stark v. Wickard, 321 U.S. 288, 302–311 (1944) ; Blair v. Freeman, 370 F.2d 229, 234 (D.C.Cir. 1966). Furthermore, those farmers now receiving the 23 cent differential would receive a still higher price for their milk if there were no "farm location differentials" at all. Consequently, these farmers have a similar interest and standing to challenge the provision. For this reason, the Court has permitted plaintiffs, who are composed both of farmers not receiving any differential and of farmers receiving the 23 cent differential, to represent all such farmers as a single class in this action.

## CLAIMED LACK OF AUTHORIZATION FOR FARM LOCATION DIFFERENTIALS

### 1. *Uniform Price Requirement*

Plaintiffs' primary contention in challenging the validity of the farm location differentials is that the differentials are unauthorized departures from the requirement of Section 8c(5) (B)(ii) of the Act, 7 U.S.C. § 608c(5) (B)(ii), that farmers receive a "uniform" price for all their milk "irrespective of the uses made of such milk by the individual handler to whom it is delivered. * * *" The farm location differentials do, of course, result in a variation in the price received by different farmers. But as agreeable as the concept of price uniformity may be in the abstract, Congress quite obviously did not look upon price uniformity as an absolute rule or even as a goal in itself. For one thing, Congress specifically provided in Section 8c(5) (B) of the Act for adjustments to the uniform price. Furthermore, Congress drafted the Act to allow marketing orders to provide for individual handler pools rather than a market wide pool. Section 8c(5)(B)(i) of the Act. In other words, at the option of the Secretary and with the approval of the dairy farmers, the Connecticut Order could simply direct that each farmer receive payment from his handler according to the utilization of all the milk disposed of by only that particular handler instead of according to the utilization of all the milk disposed of in the entire market. If this were done, there would be no uniformity of price among farmers selling their milk to different handlers.

■ What Congress hoped to achieve was orderly marketing conditions and higher prices. Sections 1 and 2 of the Act, 7 U.S.C. § 602. The attainment of these aims depends in large part upon the elimination of the incentive among dairy farmers to compete for the higher priced fluid milk market. For this reason, Congress set down the general principle that the price paid a farmer for his

milk should remain the same "irrespective of the uses made of such milk." Therefore, a variation from price uniformity is not repugnant to the Act simply because it is a variation but will be considered so if the effect of the variation is to increase competition. As the Supreme Court stated in Lehigh Valley Cooperative Farmers, Inc. v. United States, 370 U.S. 76, 79 (1962), "[i]t is in order to avoid destructive competition among milk producers for the premium outlets that the statute authorizes the Secretary to devise a method whereby uniform prices are paid by milk handlers to producers for all milk received, regardless of the form in which it leaves the plant and its ultimate use." The farm location differentials do not in any manner stimulate competition for the fluid milk market since the differentials are paid solely on the basis of the location of a producer's farm and without any regard to the particular use made of the individual producer's milk.

This is not to say that the Secretary can include in a milk marketing order any adjustments to the uniform price which he thinks advantageous and which do not bring about ruinous competition or a disorderly market. Quite the opposite is true. Plaintiffs correctly point out that, in enacting the 1935 amendments to the Agricultural Adjustment Act of 1933, Congress was greatly concerned lest milk marketing regulation fall prey to the delegation infirmities noted in the Supreme Court's then recent opinion in A.L.A. Schechter Poultry Corp. v. United States, supra. Congress carefully attempted to delineate and circumscribe the Secretary's powers.[5] Section 8c(5) provides that milk marketing orders shall contain only provisions specified in that section or terms incidental to and consistent with those specified provisions if necessary for their effectuation, and no others. Of even greater relevance is that part of Section 8c(5)(B) which makes payment of the uniform price "subject * * * only to adjustments for (a) volume, market, and production differentials customarily applied by the handlers subject to [the] order, (b) the grade or quality of the milk delivered, [and] (c) the locations at which delivery of such milk is made * * *." Congressional intent is clear that the only authorized departures from the uniform price are those enumerated in Section 8c(5)(B).

The Court therefore concludes that, although the farm location differentials are not incompatible with the marketing concept underlying the uniform price principle, the Court cannot uphold their validity unless they fall within one of the specified permissible adjustments. But even if one of the enumerated adjustments does allow such differentials, the Court can affirm the differentials contained in the Connecticut Order only if the Secretary of Agriculture relied upon that specific adjustment as justification when he promulgated the Order. SEC v. Chenery Corp., 332 U.S. 194, 196 (1947); SEC v. Chenery Corp., 318 U.S. 80, 87–88 (1943).

2. *The Secretary's Justification*

The farm location differentials were included in the Connecticut Milk Marketing Order when the Secretary of Agriculture first promulgated the Order in 1959. 24 Fed.Reg. 1049 (1959). That promulgation and the Secretary's Final Decision issued in connection therewith were the result of extensive hearings held in 1958 in accordance with Sections 8c(3) and (4) of the Act, 7 U.S.C.

---

5. H.R.Rep.No. 1241, 74th Cong., 1st Sess. 8 (1935), issued in connection with the 1935 amendments to the Agricultural Adjustment Act of 1933, states that, "To eliminate questions of improper delegation of legislative authority raised by the decisions in Schechter, et al. v. United States, the provisions relating to orders enumerate the commodities to which orders issued by the Secretary of Agriculture may be applicable, prescribe fully the administrative procedure to be followed by the Secretary in issuing, enforcing and terminating orders, and specify the terms which may be included in orders dealing with the enumerated commodities."

§§ 608c(3) and (4).[6] In his Final Decision, the Secretary set forth detailed findings with respect to the farm location differentials:

"Provision should be made also for the payment of a market differential to producers in the nearby supply area. The monies for the payment of these differentials will be obtained by a deduction from the total value of all milk before completing the computation of the market-wide uniform price * * *.

"Milk received from the nearby area has long represented the major part of the total Connecticut supply. The differentials adopted recognize the higher percentage of the milk near to the market than of milk in the more distant zones which customarily has been used for fluid purposes. Nearby producers have been able to obtain a price higher, in relation to more distant producers, than can be accounted for by the advantage in the cost of transportation to market. This historical pattern of pricing has been typical in the markets of this region, and market differentials of this type have been adopted in the nearby regulated markets. The differentials adopted will reflect more representative values with respect to the milk of both nearby and distant producers since the nearby producer will share in the higher-priced Class I market to an extent somewhat greater than otherwise would be the case under market-wide pooling.

"In addition, the use of a nearby differential will assist in providing appropriate price alignments for direct delivery producers which will permit Connecticut handlers to continue to compete in the purchase of milk on reasonable terms with dealers in adjacent markets. The amounts of such differentials are very similar to those employed in other New England Federal order markets and are in reasonable alignment with the schedule employed in the New York-New Jersey market. Such differentials were proposed and generally supported by both producers and handlers at the hearing. Their employment will tend to promote orderly marketing in the milkshed." 24 Fed.Reg. 1049, 1063 (1959).

These findings were reaffirmed by the Secretary in 1960 after lengthy hearings on the New England orders. 25 Fed.Reg. 7819, 7833–34 (1960). Most recently in 1964, after further hearings, the Secretary again ruled in favor of continuation of the differentials:

"4. *Farm location differentials.* The farm location differential provisions under the present New England orders should be continued under the Massachusetts-Rhode Island order and the Connecticut order. * * *

"Such farm location differentials have been in effect under the several New England orders since the inception of the orders. The differentials were adopted to reflect in the pricing structure of the orders historical price relationships by location which prevailed in these markets. It was found that customarily somewhat higher values, above those which normally reflected transportation costs, attached to milk produced near the principal consumption centers as compared to the market value of milk produced in the

---

6. Section 8c(3) provides:

"Whenever the Secretary of Agriculture has reason to believe that the issuance of an order will tend to effectuate the declared policy of this chapter with respect to any commodity or product thereof specified in subsection (2) of this section, he shall give due notice of and an opportunity for a hearing upon a proposed order."

Section 8c(4) provides:

"After such notice and opportunity for hearing, the Secretary of Agriculture shall issue an order if he finds and sets forth in such order, upon the evidence introduced at such hearing (in addition to such other findings as may be specifically required by this section) that the issuance of such order and all of the terms and conditions thereof will tend to effectuate the declared policy of this chapter with respect to such commodity."

more distant areas of the milkshed." 29 Fed.Reg. 11205, 11213 (1964).

The findings quoted above indicate that the Secretary considered the Connecticut farm location differentials to be "adjustments for (a) * * * market * * * differentials customarily applied by the handlers * * *" as provided in Section 8c(5)(B) of the Act. For example, at the very outset of the discussion of farm location differentials in the 1959 Final Decision, the Secretary refers to the need for the payment of a "market differential." He then discusses the differential in terms of past practice and as a "historical pattern of pricing * * * typical in the markets of this region" and points out that "market differentials of this type have been adopted in the nearby regulated markets." The Secretary's later Final Decisions contain similar references.

Plaintiffs, however, ignore this language and stress the statement by the Secretary that the differentials will permit the nearby producer to "share in the higher-priced Class I market to an extent somewhat greater than otherwise would be the case under market-wide pooling." 24 Fed.Reg. 1049, 1063 (1959). Plaintiffs argue that this is an admission that the differentials are in fact based on the utilization of milk. As indicated above, however, the differentials are paid on the basis of farm location. The use made of the milk by the handler is totally irrelevant. The commonly understood meaning of a differential, referred to in the Secretary's statement, was explained at the trial by Mr. Herbert L. Forest, Director of the Dairy Division of the United States Department of Agriculture:

"A differential in an order for any purpose means that some farmer or some farmers who get the differential get a higher price, and the only way they can get a higher price as compared with other farmers is to take it out of the higher utilization, because it is the class 1 higher value added to the pool which gives any basis for farmers getting a higher value. So

that when one producer gets a differential as compared to another, in effect he is drawing out of this higher value which class 1 has put into it. Some other farmers get less. So when we talk about differentials, we usually say he gets a bigger cut of class 1 sales, because in effect that is what it means. That is the only place the differential can come from."

Furthermore, the Secretary's conclusion that the differentials would assist in providing proper price alignments so that Connecticut handlers could compete for milk supplies with handlers in adjacent markets, far from showing that the differentials are incompatible with the Act, indicates that they are vital to achieve orderly markets, an avowed objective of the Act.

Defendant-interveners suggest that farm location differentials can also be classified as production differentials or adjustments depending on the location of delivery of milk. While the Court recognizes the force of arguments along these lines, no such findings were made by the Secretary in his Final Decisions. As the Secretary states in his brief in the instant action:

"Either the farm location differential is a proper adjustment to the uniform price within the express provisions of 8c(5) (B) (ii), i. e. a 'market differential customarily applied', or it is not. That is the real question in issue. The Secretary's finding leaves no doubt as to his justification."

The Court must therefore confine itself to consideration of whether farm location differentials are in fact market differentials customarily applied by handlers.

### 3. Legislative and Administrative History

If the phrase "market * * * differentials customarily applied by the handlers" clearly either did or did not encompass on its face farm location differentials, the Court's task would be simple. Plaintiffs, on the one hand, contend that, in view of Congressional concern over the delegation problem, only

the explicit use in the Act of the words "farm location differentials" could be taken as authorization of such differentials, and therefore the phrase relied on by the Secretary patently does not authorize these differentials. On the other hand, defendant-interveners argue that the statutory language plainly includes farm location differentials. The Court disagrees with both of these claims. A desire to delineate and circumscribe an administrator's powers does not automatically result in or insure clear, precise and self-defining statutory language. When the language does not measure up to the ideal standard, the courts would be doing a disservice to the legislative branch if, instead of using available means at arriving at the true intent of Congress, they refrained from giving the language any meaningful effect at all. A similar disservice would result if the courts went to the other extreme and held the language to include everything that any conceivable reading could find it to include. It is perfectly obvious to the Court that the term "market differentials" is sufficiently broad and indefinite when used in connection with marketing orders to encompass many types of differential; but by the same token this broadness does not necessarily mean that Congress intended it to have such a wide scope. The Court therefore finds entirely proper the suggestion of the Secretary that the Court resort to the usual aids to legislative interpretation in order to ascertain whether Congress intended farm location differentials to be encompassed by "market * * * differentials customarily applied by the handlers subject to such order."

Examination of the House of Representatives report, H.R.Rep.No. 1241, 74th Cong., 1st Sess. (1935), and the similar Senate report, S.Rep.No. 1011, 74th Cong., 1st Sess. (1935), which accompanied the 1935 amendments to the Agricultural Adjustment Act of 1933, does not result in immediate clarification of the issue. On the one hand, the reports evidence a clear Congressional intent to affirm the varied marketing efforts and practices engaged in by the cooperatives prior to the 1933 Act and continued pursuant to licenses issued under that Act, and to encourage local variations in marketing plans.

"The proposed amendments substitute the word 'order' for 'license' in order more accurately to describe the nature of the Secretary's regulatory power. The operations of cooperative marketing associations will be reenforced by the new sections of the bill dealing with these matters and these provisions will assure the cooperation of processors and distributors in programs intended to raise farm prices. The marketing agreements and licenses which have been issued and entered into pursuant to the Agricultural Adjustment Act have contained a great variety of provisions in order to adapt each particular program to the peculiar problems and circumstances presented in a given area by a particular commodity.

 &#42; &#42; &#42; &#42; &#42; &#42;

"So that proper recognition may be given to local differences which may exist in production or marketing methods or conditions, orders are required to be limited in their application to the smallest practicable regional production or marketing areas, and orders applicable to the same commodity or product are required to prescribe such terms applicable to different production or marketing areas as will recognize local production and marketing differences. Orders relating to milk and its products are exempted from the requirement that they be limited in their application to the smallest practicable regional production or marketing areas.

 &#42; &#42; &#42; &#42; &#42; &#42;

"Third. Subsection (5) of the proposed section 8c states specifically the terms which may be included in orders relating to milk and its products. These terms follow the methods employed by cooperative associations of producers prior to the enactment of the Agricultural Adjustment Act and the provisions of licenses issued pur-

suant to the present section 8(3) of the Agricultural Adjustment Act." H.R.Rep.No. 1241, supra at 7, 9; see S. Rep.No. 1011, supra at 9.

On the other hand, the definitions of volume, production, and market differentials given in the reports would, if followed, make invalid many of the local adjustments and variations achieved by cooperatives and continued under the licenses.

"Minimum prices fixed in such orders are required to be uniform as to all handlers, subject to adjustments for differences in the grade and quality of the milk delivered, for differences in transportation costs from the place at which delivery is made to the handler to the distributing or processing plant, and for volume, market, and production differentials customarily applied by handlers. The volume differential is a differential which is paid when the operations of several country plants are consolidated into one plant. The inconvenience which is caused to producers by closing up plants to which they have been delivering and requiring that all of their milk be handled by one plant, is compensated by an additional payment to the producers. The production differential is the differential which is paid to a producer, compensating him for keeping his farm and milk qualified for a city market even though his milk may actually be going into manufactured use. It is necessary to keep this supply of reserve milk available for periods in which consumption of milk goes up so that the effect is that the producers must keep their farm in the same condition as if they were shipping milk into the city every day. The production differential is a payment to the farmer for performing this function in the market.

"The market differential is a differential which is given to the producer to compensate him for delivering his milk to a city market instead of to a country plant. These differentials vary with the markets and

cannot be qualified as a 'location' differential, because of the fact that location is usually determined on the distance from a primary market whereas market differentials are usually paid in secondary markets." H.R. Rep.No. 1241, supra at 9–10; S.Rep. No. 1011, supra.

At the trial, witnesses thoroughly familiar with milk marketing both prior to and after the enactment of the 1933 Act testified that these definitions not only excluded differentials in use under the licensing programs but that at least one of the definitions failed to describe any differential then in existence. Richard D. Aplin, who was Assistant Market Administrator under the first federal milk license for the Boston market beginning in 1933 and who is now Market Administrator under the Massachusetts-Rhode Island Order, testified that a volume differential as defined in the reports was paid only by the Dairymen's League Cooperative in New York in the late 1920's and early 1930's, but that a differential for large volume producers was common practice. Mr. Aplin further stated that he knew of no differential that fell within the definition of production differentials as described in the reports although here again he knew of differentials in existence which could be called production differentials, as for example, payments for maintaining evenness of production throughout the year. With respect to market differentials, Mr. Aplin testified that, while the definition given might apply to higher payments made at city plants, such payments, contrary to the reports, were made only in primary markets and not in secondary ones. He himself believed that the farm location differentials, which he stated customarily were paid in New England, were really market differentials.

Donald Hammerberg, Market Administrator under the Connecticut Order, essentially corroborated Mr. Aplin's testimony, although he was not familiar with the volume differential paid by the Dairymen's League and knew of no dif-

ferentials which would fit the definition of market differentials described in the reports.

Two men who participated in drafting the 1935 amendments, Reuben Hall and Donald Kane, testified that the language with respect to volume, market and production differentials was not decided upon until the day before the legislation was introduced and that the problem had been to choose language specific enough to satisfy delegation requirements and yet broad enough to permit the Secretary to adapt the orders to meet varying conditions and to create stability. They stated that the language agreed upon purposely was chosen for its breadth and it definitely was contemplated by the drafters that the phrase "market differentials customarily applied" should include farm location differentials.[7]

That Congress did not in fact intend to be restrictive in its authorization of differentials is most strikingly illustrated by a colloquy which took place on the Senate floor between Senator Copeland of New York and Senator Murphy, the floor manager of the bill, after issuance of the Committee reports. 74 Cong.Rec. 1139–40 (1935). Senator Copeland first inquired about the effect of equalization on the supply of milk.

"MR. COPELAND. What has the Senator to say to the suggestion that in a number of communities in up-State New York there is not a sufficient supply of milk surrounding the market to take care of the demand; therefore, milk must be brought into the market from more distant points? The provisions of the equalization which we are now discussing provide that a producer who is producing his milk on farms near to cities would receive the same price for his product as a farmer who produces his milk, say, 40 or 50 miles away from the same community."

Senator Murphy replied that Senator Copeland was generally correct.

"MR. MURPHY. If they were embraced in the same marketing area, that would be true. Let us keep in mind what the situation is. There is a deficiency of consumer demand. There is a surplus of milk. The price is greatly depressed, and has been for 5 years. The only way in which one can determine how each one of the producers included in the plan provided here shall bear his share of the cost of effecting a higher price is to divide the milk by classification uses."

Senator Copeland, however, was not satisfied with this response.

"MR. COPELAND. I do not think the Senator has quite stated all the conditions. He does not take into consideration the difference in the cost of production. Taxes and values of property near the city are very much higher than in the case of property farther away from the city. The transportation differential .does not compensate for the difference in cost, as I see it."

The answer then given by Senator Murphy demonstrates that differentials, such as farm location differentials, were contemplated.

"MR. MURPHY. If the Senator will refer to page 12, line 13, he will see that there is this qualification:

'Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order—'

*They adopt the present practice of business—*

'(2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers.'" (Emphasis added)

7. Justice Frankfurter in his dissenting opinion in Stark v. Wickard, 321 U.S. 288, 315 (1944), noted that the Act was "devised by those who know the needs of the industry and drafted by legislative specialists * * *."

In view of these remarks by Senator Murphy, and in view of the testimony of two of the drafters of the statutory language in question, and considering the expressions of intent in the Committee reports that local variations and past practices under cooperative and licensing agreements should continue, the Court concludes that the narrow definition of market differentials contained in the Committee reports must be read as illustrative rather than as restrictive.

At the trial much evidence was introduced by the Secretary and defendant-interveners as to differentials received in the 1920's and 1930's by milk producers whose farms were located in close proximity to the Boston market. While this evidence does not directly justify the inclusion of similar differentials in the Connecticut Order, it is relevant insofar as it establishes that payment of farm location differentials was in fact an approved "practice of business" at the time of the enactment of the 1935 amendments to the Agricultural Adjustment Act of 1933 and that such differentials were therefore contemplated by Congress.

Reuben Hall testified that beginning in the mid-1920's and continuing right up until the advent of federal licensing in 1933 it was the voluntarily agreed upon practice of handlers under contract with the New England Milk Producers Association to pay a premium to nearby farmers of about 46¢ per hundredweight; this was derived from an amount otherwise payable to all producers. Sometimes this was achieved by what was called a preferential base rating plan which meant that a greater proportion of a nearby producer's milk was treated as being used as higher priced Class I or fluid milk. The premium was over and above any additional amounts paid to nearby producers by handlers because of savings in transporting the milk to market. It was simply part of a self-imposed, self-regulating program designed to stabilize the market.

The first federal license under the Agricultural Adjustment Act was issued by the Secretary on October 30, 1933 and became effective on November 3, 1933. Under the license, a preferential base was used to maintain the differential of approximately 46¢ per hundredweight above transportation cost savings which previously had been paid to nearby farmers. Admittedly, under the language of the license the preferential base was granted to farmers who delivered their milk directly to the handlers' city plants. But, as a number of witnesses testified, only producers whose farms were nearby the city could deliver to the city plants because of the delivery methods then in existence. The others had to deliver to country stations and therefore did not receive the preferential base. The result was that the license in effect provided for a differential to producers with nearby farms. That those administering the license thought they were doing just this is evident from a pamphlet entitled "The Boston Milk License" issued August 1, 1934 by the Boston Market Administrator. Although the pamphlet was distributed in connection with a second Boston license which had replaced the first on March 16, 1934, the pamphlet's author, who was the witness Richard Aplin, was referring to the provisions of the first license and the conditions surrounding its issuance when he stated:

"It was found that in past years the producers who were located near Boston had consistently received the fluid milk price for a larger proportion of their milk on account of their having been able to adjust their production more closely to the requirements of their distributors. A careful study by the Administrator, covering the eight-year period from 1926 to 1934, showed that the assignment of 85% bases to these producers would result in giving to them the same relative advantage that they have had during the past over producers who were located at a greater distance from the market. Consequently producers whose milk was delivered directly to a distributor's city plant within 35 miles of the State House in Boston

were assigned base ratings equal to 85% of their average deliveries of milk in September, October and November, 1933, or 85% of their average daily deliveries of milk for the entire year 1933, whichever amount was greater in each case. A few groups of producers who were delivering milk to plants more than 35 miles, but less than 100 miles, from the State House at Boston, were given bases less than 85%, but more than 61% of their 1933 production."

Actually, the preferential treatment accorded nearby farmers was continued under the second license although that license left it to the Market Administrator to determine each individual farmer's base.

The second Boston license was declared invalid on May 17, 1935 by the District Court for the District of Massachusetts in United States v. Seven Oaks Dairy Co., 10 F.Supp. 995 (D.Mass. 1935). The license, however, remained on the books until February 9, 1936 when it was replaced by the first order under the 1935 amendments to the Agricultural Adjustment Act of 1933. Under this order, there were no preferential bases as such —all farmers' bases were determined by the same formula—but those producers whose farms were within forty miles of the State House in Boston and who delivered to a plant within forty miles of the State House received a higher price for all their base milk than those farmers delivering to a plant within forty miles of the State House but whose farms were located more than forty miles away. Thus, this differential unquestionably was based solely on the location of a producer's farm.

The first Boston order was suspended by the Secretary on July 31, 1936 when the District Court for the District of Massachusetts held the Agricultural Adjustment Act unconstitutional in United States v. David Buttrick Co., 15 F.Supp. 655 (D.Mass. 1936), rev'd, 91 F.2d 66 (1 Cir. 1937). After passage of the Agricultural Marketing Agreement Act on June 3, 1937, the Secretary reinstated the order in part, effective July 1, 1937.

The order was then amended and as amended became fully effective on August 1, 1937. 2 Fed.Reg. 1588 (1937). The amended order eliminated base ratings entirely and simply provided for the payment of a 46¢ differential to producers with farms located near the State House, and a 23¢ differential to producers with farms situated at an intermediate distance. 2 Fed.Reg. 1588, 1590 (1937). This provision in essence remained in effect in all orders regulating the Boston market until it was declared invalid in Allen v. Freeman, Civil Action 3379–66 (D.D.C., June 15, 1967), aff'd sub nom, Zuber v. Allen, 402 F.2d 660 (D.C.Cir. 1968), petition for cert. filed, 37 U.S.L.W. 3229 (U.S.Dec. 20, 23, 1968) Nos. 861, 874). See Zuber v. Allen, 387 F.2d 862 (D.C.Cir.1967). The farm location differentials contained in the Connecticut Marketing Order are the equivalent of the Boston differentials.

This fundamental continuity in the use of farm location differentials beginning in a period of attempted self-regulation and progressing through various stages of government regulation clearly suggests that Congress recognized the need for such differentials and intended to authorize them.

Certainly those people in the industry and government most intimately involved in drafting the regulatory language and in administering the resulting legislation believed that Congress intended to authorize farm location differentials, and they continue to believe so. Their opinions cannot be ignored. As the Supreme Court stated in United States v. American Trucking Associations, Inc., 310 U.S. 534, 549 (1940):

> "In any case such interpretations are entitled to great weight. This is peculiarly true here where the interpretations involve 'contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.'"

See also Udall v. Tallman, 380 U.S. 1, 16 (1965); Power Reactor Development

Co. v. International Union of Electrical, Radio and Machine Workers, AFL-CIO, 367 U.S. 396, 408 (1961); Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315 (1933). Indeed, such deference is to be accorded administrative interpretation of statutory language that to sustain such an interpretation, the Court "need not find that [the administrative] construction is the only reasonable one, or even that it is the result [the Court] would have reached had the question arisen in the first instance in judicial proceedings." Unemployment Compensation Comm'n v. Aragon, 329 U.S. 143, 153 (1946). See also, e. g., Udall v. Tallman, supra, at 16.

Congressional reenactment of the 1935 amendments to the Agricultural Adjustment Act of 1933 in the Agricultural Marketing Agreement Act of 1937 is, under the circumstances of this particular legislation, an indication that Congress approved the use of farm location differentials, since the 1936 Boston order issued under those amendments contained such differentials. In Queensboro Farms Products v. Wickard, 137 F.2d 969 (2 Cir. 1943), an attack on a provision of the milk order regulating the New York metropolitan milk market drew in question the meaning of the phrase "use classification" in Section 8c (5)(A) of the Act. The Court, in an opinion by Judge Frank, upheld the Secretary's interpretation of the language of the Act and in so doing alluded to the significance of the 1937 reenactment of the 1935 amendments:

"After the Act was amended in 1935, the Secretary issued several regional milk orders. In some of them, he adopted as a measure of 'use,' and as a basis for classification, the form in which milk was sold by, or moved from, the plants of, handlers. While those orders were in effect, Congress (because of the decision in United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914, holding certain aspects of the Act unconstitutional) after reconsidering inter alia, the provisions which had been added in 1935 and pursuant to which these orders had been made, reenacted those 1935 provisions with amendments not here pertinent. It is true, of course, that bald re-enactment of statutory provisions, without more, need not be given much weight as indicating an adoption of preceding administrative interpretation; but where careful consideration has—as in the case of the statute before us—been given by Congress in connection with a re-enactment much is to be said for a contention that Congress intended to adopt the intervening administrative interpretation." (Footnotes omitted) Id. at 976–77.

Judge Frank's conclusion is equally applicable here.

Furthermore, the 1937 reenactment goes a step beyond implicit approval of the differentials. Section 4 of the Act, 50 Stat. 249, provides:

"Nothing in this Act shall be construed as invalidating any marketing agreement, license, or order, or any regulation relating to, or any provision of, or any act of the Secretary of Agriculture in connection with, any such agreement, license, or order which has been executed, issued, approved, or done under the Agricultural Adjustment Act, or any amendment thereof, but such marketing agreements, licenses, orders, regulations, provisions, and acts are hereby expressly ratified, legalized, and confirmed."

What otherwise might be a meritorious argument that Congress simply intended to prevent technical abatement of prior orders is countered by the Committee Report of the House of Representatives accompanying the proposed legislation.

"Section 4 of the bill negatives any implication that its effect is to invalidate or cast doubt on action heretofore taken under the agreements and orders provisions. The section also expressly ratifies, legalizes, and confirms such action. Judicial sanction for such a provision is found in Mattingly v. District of Columbia ((1878),

97 U.S. 687, 690); United States v. Heinzen ((1907), 206 U.S. 370, 382); Tiaco v. Forbes ((1913), 228 U.S. 549, 556); Rafferty v. Smith, Bell & Co. ((1921), 257 U.S. 226, 232); Isbrandtsen-Moller Company, Inc., v. United States et al. (No. 307, October term, 1936, United States Supreme Court, decided Feb. 1, 1937); and Swayne & Hoyt, Ltd., et al. v. United States (No. 494, October term, 1936, United States Supreme Court, decided Mar. 1, 1937)." H.Rep.No. 468, 75th Cong., 1st Sess. 4 (1937).

The first sentence makes it clear that Congress indeed wished to avoid technical abatements; but the second sentence, by use of the word "also", demonstrates that Section 4 was further designed to ratify, legalize and confirm affirmatively the provisions of past orders. Moreover, the cases cited in the report all involved instances in which Congress had legalized or ratified prior executive action; none of them was concerned with mere technical abatement.[8]

Finally, it is important to note that, in all the years since passage of the 1935 amendments and the 1937 Act, farm location differentials have been used in a number of marketing orders by the Secretary, and Congress has taken no action to put an end to the practice. Cf. Udall v. Tallman, supra, at 408–09.

This history of reenactment, confirmation, and acquiescence does not directly establish that farm location differentials as contained in the Connecticut Order are a proper exercise of administrative power. That depends in part upon whether there is substantial evidence in the record to support the Secretary's findings. The history, however, does tend to support the conclusion that farm location differentials as a general proposition are authorized by the Act and approved by Congress for use in marketing areas where historically they have been paid by handlers and their continued payment will tend to effectuate the purposes of the Act.

#### 4. *Not a Trade Barrier*

Plaintiffs further contend that farm location differentials constitute a trade barrier in violation of Section 8c(5)(G) of the Act, 7 U.S.C. § 608c (5)(G). That section provides that milk marketing orders shall not "prohibit or in any way limit, in the case of the products of milk, the marketing in that area of any milk or product thereof produced in any production area in the United States."

Plaintiffs' argument is without merit. The record is devoid of evidence showing that payment of the differential in any way prohibits or limits the flow of milk or its products into or within the Connecticut market. See Freeman v. Lewes Dairy, Inc., 337 F.2d 827 (3 Cir. 1964), cert. denied, 379 U.S. 1000 (1965); cf. Lewes Dairy, Inc. v. Freeman, 260 F. Supp. 921 (D.Del.1966), appeal pending. In fact, plaintiffs admitted at trial that they had switched from shipping into other markets to ship into Connecticut

---

8. In Brannan v. Stark, 342 U.S. 451, 465–66 (1952), the Supreme Court was presented with the argument that Section 4 of the Act validated all provisions in future orders which were similar to provisions in orders existing at the time of passage of the 1937 Act. The Supreme Court, in holding that a particular type of payment to cooperatives was unauthorized by the Act, stated that "[e]ven if we were to accept the proposition that Congress there intended to confer statutory authority for all future provisions like any of those then existing in any marketing order, we would reach the same conclusion because neither the provisions for these particular payments nor any closely analogous provisions were at that time present in any marketing orders." The situation is different here where the equivalent of farm location differentials was contained in an order in effect when the 1937 Act was passed. Furthermore, this Court in no way accepts the proposition that Section 4 automatically validates the inclusion of farm location differentials in any order. The Court simply is of the opinion that Section 4 represents Congressional reiteration of its intent to authorize the inclusion of farm location differentials in orders governing marketing areas where such differentials have customarily been paid.

because they obtained a better price for their milk under the Connecticut Order.

It must also be noted that farms receiving the benefit of the differential are not limited to Connecticut farms but include farms in Rhode Island and neighboring portions of New York and Massachusetts—areas from which milk can be shipped directly to market in Connecticut. Thus, the differential clearly is not designed to limit the flow of out-of-state milk.

Furthermore, even if payment of the differential could be construed in some way as limiting the flow of milk, Section 8c(5)(G) was not designed to prevent such limitations where they result from the exercise of express authority conferred by Sections 8c(5)(A) and (B) to classify, price and pool milk and to make adjustments. Apparently Section 8c(5)(G) originated in the House of Representatives as an amendment to the bill. As first introduced by Congressman Andresen, it simply provided that no marketing order shall "prohibit" the marketing in that area of any "milk or milk product" produced in any area of the United States. 79 Cong.Rec. 9572 (1935). Congressman Southoff then suggested that the provision be strengthened by substituting the words "limit or tend to limit" for the word "prohibit." Id. Congressman Jones, the floor manager of the bill, immediately pointed out that if the words "limit or tend to limit" were substituted, it "would absolutely wreck the whole milk program." He then offered an explanation for his position:

> "In order to get away from the terrific conditions that have prevailed in the milk industry there is provided in the bill authority to fix a minimum price to producers. That, at least in a measure, would limit or tend to limit shipment, and yet the gentleman, I am sure, does not want to interfere with the price to producers. Then it is a universal custom in the marketing of milk to classify milk. This, in a way, is a limitation.
>
> "I am perfectly willing to adopt the first amendment suggested, because

that simply treats all areas alike, for you could not prohibit someone from an outside area coming in so long as he complied with the conditions prescribed for that area; but if you said that no restrictions or limitations could be required, it would wreck the program, it would destroy every vestige of a program we have for milk."

The result was that the wording of Section 8c(5)(G), as finally adopted, carefully avoided the problem alluded to by Congressman Jones. This is made quite clear in the conference report accompanying the proposed legislation:

> "Amendment no. 24: Under the House bill, no marketing agreement or order applicable to milk and its products in any marketing area could prohibit the marketing in that area of any milk or product thereof produced in any production area in the United States. The Senate amendment extended this provision so that no marketing agreement or order so applicable could limit in any manner the marketing in the marketing area of milk or its products produced anywhere except that certain limitations on the marketing of milk were specifically permitted. The conference agreement retains the House provision with respect to prohibitions on marketing of both milk and products of milk. The conference agreement also denies the authority to limit in any manner the marketing in any area of milk products (butter, cheese, cream, etc.) produced anywhere in the United States. *The language adopted by the conference agreement does not refer to milk, and so does not negative the applicability to milk, for use in fluid form or for manufacturing purposes, of the provisions of the bill relating to milk, such as the provisions on price fixing, price adjustment, payments for milk, etc.*" H.R.Rep. No. 1757, 74th Cong., 1st Sess. 21 (1935). (Emphasis added)

Thus farm location differentials, permitted as they are as market differen-

tials, are not prohibited by Section 8c (5)(G).

Lehigh Valley Cooperative Farmers, Inc. v. United States, 370 U.S. 76 (1962), is not authority to the contrary. In that case the Supreme Court held invalid as a trade barrier in violation of Section 8c(5)(G) a provision in the New York-New Jersey Order which required special payments to be made on certain otherwise unregulated milk shipped into the marketing area. The Supreme Court found that this requirement in effect precluded or severely curtailed the shipment of such milk into the market. Id. at 86–87. Significantly, the only authorization offered by the Secretary for the requirement was Section 8c (7)(D) of the Act, 7 U.S.C. § 608c(7) (D), which permits the Secretary to include terms in Orders which are incidental to the provisions specified in Section 8c(5) of the Act only if those terms are not inconsistent with those provisions and are necessary to effectuate them. The Supreme Court concluded that, since the requirement was inconsistent with Section 8c(5)(G), it could not be justified by Section 8c(7)(D). Id. at 98. In the present case the differentials do not exclude milk from the area nor does the Secretary attempt to justify them as being incidental to other authorized provisions.

5. *Judicial Interpretation*

The validity of farm location differentials was passed upon and approved by the courts shortly after the passage of the 1937 Act. Numerous handlers in the Boston area refused to comply with the Greater Boston Milk Marketing Order when it became effective in its amended form on August 1, 1937. In response, the government sought and obtained temporary injunctions against the handlers in the District Court. United States v. Whiting Milk Co., 21 F.Supp. 321 (D. Mass.1937); United States v. H. P. Hood & Sons, Inc., 26 F.Supp. 672 (D.Mass. 1939). These cases, after being docketed on appeal in the Circuit Court of Appeals for the First Circuit, went directly to the Supreme Court on certiorari where they were considered along with cases challenging the validity of the milk marketing order regulating the handling of milk in the New York metropolitan area. The result was that the Supreme Court handed down two opinions. In the first, United States v. Rock Royal Co-operative, Inc., 307 U.S. 533 (1939), the Supreme Court considered extensive attacks on the constitutionality of the 1937 Act and the validity of the New York Milk Marketing Order; the Court upheld both the Act and the Order. In the second, H. P. Hood & Sons, Inc. v. United States, 307 U.S. 588 (1939), the Supreme Court sustained the Boston Order.

The New York Order considered in *Rock Royal* contained provision for the payment of a 25¢ differential to farmers delivering their milk to handlers' plants located in eighteen counties near New York City. While five cents of the differential was paid out of the handlers' own pockets, the other twenty cents was obtained by deducting that amount from the price which otherwise would be paid to all farmers—precisely the manner in which the Connecticut farm location differentials operate. Furthermore, as was pointed out in connection with a similarly worded differential in the first Boston license of 1933, delivery to plants in those counties meant that the farms from which the deliveries were made were located there. In fact, those persons involved with the differential always spoke of it as a differential paid on the basis of farm location. Thus, the District Court in the *Rock Royal* case, in discussing the differential, stated:

> "[The handlers] are also required to pay into the Producers Settlement Fund to provide preferential payments made to producers living in 18 counties, under the provisions of Article 6, Section. 8. The producers in those counties receive 20 cents per cwt. in addition to the locational differentials, which return them a higher price for their milk because they are located nearer New York." 26 F.Supp. 534, 554 (N.D.N.Y.1939).

The District Court held the differential invalid and refused enforcement of the Order on this and other grounds. On appeal to the Supreme Court, the government defended the differential as one based on farm location:

> "There was ample evidence before the Secretary to justify the reasonableness of the nearby differentials. The 18 counties to which the nearby differentials apply are all very close to the marketing area and are separated from the rest of the milkshed by nonproductive mountainous territory \* \* \*. The milk of producers in these counties is readily available for use in the fluid market and producers in these counties have always enjoyed an almost exclusively fluid market, not by reason of accidents of competition but by reason of their natural advantages. Accordingly, it was reasonable that these producers should receive a special differential." Brief for the United States, Oct. Term, 1938, No. 771, at 60–61.

The appellee, on the other hand, argued as plaintiffs do in the instant action that the differential was "neither contemplated nor authorized by the Act", was "repugnant to 'equalization', which the statute sought to accomplish" and was the "basis of inequality". Brief for Rock Royal Co-operative, Oct. Term, 1938, No. 771, at 76.

The Supreme Court, in reversing the District Court, held that "[t]he Act authorizes such an arrangement", citing Section 8c(5)(A). 307 U.S. at 567.

It is true that *Rock Royal* was a suit involving handlers and not producers; and Section 8c(5)(A) applies to the former rather than the latter. But Section 8c(5)(A) provides for the same uniform prices subject to the same adjustments as set out in identical language in Section 8c(5)(B) applicable to producers. Therefore, the Supreme Court's holding that Section 8c(5)(A) "authorizes such an arrangement" is most certainly authority that Section 8c (5)(B) authorizes the same arrangement.

It is also true that the Supreme Court refrained from considering the District Court's finding that the differential was discriminatory as to producers since only handlers were involved in the action. The Supreme Court, however, did reject contentions of discrimination against handlers made by appellees because they were "fanciful and remote" and "would not justify a court in overturning the Secretary's determination of the propriety of the differentials on evidence found by the lower court to be substantial." 307 U.S. at 567. The Supreme Court further concluded that "[s]uch an administrative determination carries a presumption of the existence of a state of facts justifying the action far too strong to be overturned by such suggestions as are made here." 307 U.S. at 567–68.

While generally upholding the validity of the Boston Milk Marketing Order in H. P. Hood & Sons, Inc. v. United States, supra, the Supreme Court omitted any specific discussion of the farm location differentials contained in the Order. These differentials had been challenged in the lower court but the challenge apparently was not pressed in the Supreme Court. See Green Valley Creamery, Inc. v. United States, 108 F.2d 342, 344 (1 Cir. 1939). The Supreme Court, however, did note that, pursuant to the Order, adjustments were made for differentials. 307 U.S. at 594. In view of this and the Court's simultaneous decision in *Rock Royal,* it may be assumed that the Court was not struck by any essential distinction between the differentials in *H. P. Hood & Sons* and the differential it upheld in *Rock Royal.*

If there is any doubt as to whether the Supreme Court gave full consideration to the validity of farm location differentials, there can be no doubt that the differentials received such consideration by the Court of Appeals for the First Circuit. Approximately six months after the Supreme Court rendered its decisions in *H. P. Hood & Sons* and *Rock Royal,* the Court of Appeals for the First Circuit decided Green Valley Creamery, Inc. v. United States, 108 F.2d 342 (1 Cir. 1939).

In that opinion the court first noted that, because of the prior Supreme Court decisions, appellants, who were milk handlers, were no longer free to question the constitutionality of the Act nor the validity of most of the terms of the Boston Order. The court, however, did permit them to challenge three provisions of the Boston Order because attacks on these provisions had not been pressed before the Supreme Court. One of these provisions established the farm location differentials and another specified two sets of minimum prices, the higher applicable to milk purchased from associations of producers, and the lower applicable to milk purchased directly from individual producers.

The court found that the two sets of minimum prices were justified as "a market differential customarily applied by handlers." Id. at 345. The court held that the evidence before the Secretary supported a finding that a higher price had customarily been paid in the market area to producers' associations because such milk had "an enhanced value" due to the fact that many marketing services had already been performed by the associations. The court further held that "[t]he phrase 'market differential', undefined as it is in the Act, is reasonably susceptible of such an interpretation." Id. Thus the court rejected the narrow definition of "market differential" suggested by some of the language in the Senate and House Committee reports and argued here by plaintiffs.[9] As a further ground for its decision the court noted that the provision existed in the Boston Order prior to the 1937 Congressional reenactment without change of the 1935 amendments to the Agricultural Adjustment Act of 1933.

In considering the farm location differentials, the court placed heavy emphasis on the fact that such differentials had been paid historically.

"There was evidence before the Secretary to the effect that similar differentials in favor of nearby farms had existed in the Boston market for many years. Various factors were mentioned as accounting for this, including their greater accessibility to the market, and their greater dependability as sources of supply, because, as experience showed, the nearby farms had a more uniform level of production throughout the year. These producers were also potential dealers, who might establish their own milk routes in competition with handlers in the Boston market, if prices were not acceptable. Whatever the explanation, this group of producers in fact commanded somewhat more favorable prices for their fluid milk as against producers more remotely located. The differentials now objected to were inserted in the Order so as not to disturb the status quo in this respect." Id. at 346.

The court recognized that "[m]ilk entering the Boston market from nearby farms is presumably delivered to handlers at points nearby the market", and therefore the differentials could be authorized pursuant to Section 8c(5)(B)(ii) of the Act as differentials based upon "the locations at which delivery of such milk is made." Id. But the court found it unnecessary to further develop this point because it concluded that

" * * * the differentials can readily be sustained under Section 8c(5)(B) (ii) (a) of the Act as market differentials which had customarily been applied by handlers subject to the Order.

9. The Supreme Court apparently approves of the First Circuit's view of the proper scope to be accorded the term "market differential". In Brannan v. Stark, 342 U.S. 451, 466 (1952), the Supreme Court found a certain type of payment to producers' associations unauthorized by any provision of the Act but stated that:

"Many provisions for payments to cooperatives appearing in other orders have been of a kind specifically authorized by the statute. Thus, the provision of the first Boston Milk Order for a price differential as between cooperative milk and noncooperative milk was upheld in Green Valley Creamery v. United States, as a 'market differential' authorized by § 8c(5) (A) (1)." (footnote omitted)

They are called 'location differentials' in the Order, and so they are; but they are also customary market differentials based upon the location of farms nearby the market." Id.

The court also observed that the farm location differentials were part of the Boston order at the time of the 1937 reenactment of the 1935 amendments to the Agricultural Adjustment Act of 1933.

Thus the Court of Appeals clearly found, as the Secretary contends here, that farm location differentials are market differentials authorized by the Act where such differentials customarily have been paid. It was only after the court had so concluded that it noted that handlers lacked standing to raise the issue because the differentials affected only producers. This Court is of the opinion that the Court of Appeals' final point in no way weakens the authority of its prior conclusions concerning the validity of the differentials and that these conclusions should be afforded great weight, coming as they did such a short time after enactment of the legislation in question. Certainly a court sitting contemporaneously with a legislature is in a better position to ascertain the true intent of that legislature than a court sitting some thirty years later.

Plaintiffs place great reliance on the recent decisions of Blair v. Freeman, 370 F.2d 229 (D.C.Cir. 1966), and Allen v. Freeman, Civil Action 3379–66 (D.D.C., June 15, 1967), aff'd sub nom, Zuber v. Allen, 402 F.2d 660 (D.C.Cir. 1968), petitions for cert. filed 37 U.S.L.W. 3229 (U.S. Dec. 20, 23, 1968) (Nos. 861, 874). See Zuber v. Allen, 387 F.2d 862 (D.C. Cir. 1967).

In *Blair*, the Court of Appeals for the District of Columbia Circuit held invalid the farm location differentials then contained in the New York-New Jersey Milk Marketing Order, 7 C.F.R. § 1002 (1968). Certain factual differences exist between the circumstances found by the court in *Blair* and the circumstances in the instant case. For example, the differentials in the New York-New Jersey Order varied in amount according to the total utilization of fluid milk in the market, a factor which bore heavily on the Court of Appeals' conclusion that the differentials represented impermissible variations in price based on the use of milk. The Connecticut differentials, however, remain constant in amount. Another example is that the Secretary attempted to justify the New York-New Jersey differentials as "adjustments for the locations at which delivery of such milk is made." No such attempt is made here by the Secretary. Instead the Secretary squarely places his reliance on "market differentials customarily applied by the handlers."

Despite the differences in fact, this Court recognizes that its holding is based on conclusions which are contrary to those reached in *Blair*. The Court is indeed reluctant to disagree with such a distinguished court as the Court of Appeals for the District of Columbia and does so only with the greatest respect and deference. But while the Court agrees with the Court of Appeals for the District of Columbia that the uniform price requirement was designed to eliminate ruinous competition for the fluid milk market, it cannot accept the Court of Appeals' conclusion that the requirement prohibits recognition of the historic fact that farmers located in particular areas near the market were accorded a greater share of that market. Similarly, the Court agrees with the Court of Appeals that Congress was concerned in 1935 with the delegation problem and attempted to make the provisions of the Act specific. But the fact remains, as noted in Green Valley Creamery, Inc. v. United States, supra, at 345, that the phrase "market differential" remains undefined in the Act. And while the court in *Blair*, at 238, concluded that "[t]he 'market differential' rationale is plainly not a tenable basis for the nearby differential" because "it is plain that this type of allowance turns not on the location of the producer's farms but on the nature of the market to which they deliver their milk," the court in *Green Valley Creamery*, just several years after the provision's enactment,

held squarely to the contrary.[10] Therefore, faced with conflicting authority and an action involving an independent order and separate differentials, the Court believes it is justified, for the reasons it has previously attempted to develop, in holding that farm location differentials are authorized by the Act as market differentials.

The plaintiffs in Allen v. Freeman, supra, attacked the farm location differentials contained in the Massachusetts-Rhode Island Milk Marketing Order, 7 C.F.R. § 1001 (1968). The District Court for the District of Columbia granted plaintiffs' motion for summary judgment, without opinion, on the basis of the *Blair* decision; that judgment has now been affirmed by the Court of Appeals for the District of Columbia. Zuber v. Allen, supra. As to this decision, nothing need be added to what has already been said with respect to the decision in *Blair*.

## CLAIM OF UNCONSTITUTIONAL DISCRIMINATION

Another claim made by plaintiffs is that the Connecticut farm location differentials are unconstitutionally discriminatory because they result in certain farmers receiving more for their milk than others. If the differentials were paid without reference to any rational basis, this claim would be correct. But the Act authorizes such differentials only if they have been customarily paid, and customary payment is alone a sufficient rationale for continued payment under a scheme of regulation. Secretary of Agriculture v. Central Roig Refining Co., 338 U.S. 604, 616–18 (1950). Therefore, a critical question with respect to both the authorization of the Connecticut farm location differentials and the issue of discrimination is whether the evidence before the Secretary supported the Secretary's findings that the differentials were customarily paid in the Connecticut area and that their continued payment would tend to effectuate the policies of the Act.

## CLAIM OF INSUBSTANTIAL EVIDENCE

After an extensive review of the voluminous record of the administrative hearings held in connection with the promulgation of the Connecticut Milk Marketing Order, the Court is of the opinion that the evidence before the Secretary in support of his findings that farm location differentials were customarily paid in the Connecticut area and that their continued payment would tend to effectuate the policies of the Act was substantial and fully justified those findings.

In 1958, a proposed federal milk marketing order for the Connecticut market was considered in hearings held at Hartford, Connecticut. The proposed order included a farm location differentials provision. Dr. C. W. Swonger, an economist for the New England Milk Producers' Association, testified at length concerning the differentials— their basis and the need for them. Hearing Record, 1958 Basic Connecticut Promulgation Proceeding 1261–69 (hereafter, 1958 H.R.). He demonstrated how "producers located near the market have been able to obtain prices for their milk higher than could be explained solely on the basis of handling and transportation costs." 1958 H.R. 1267. With specific reference to the Connecticut market, Dr. Swonger stated that

> "[d]espite the competition of unregulated milk, and the lack of any control over prices paid for such milk, nearby producers in Connecticut have continued to receive blended prices higher than those paid to nearby producers in Boston, and from 1 to 2 cents per quart higher than the freight and handling costs reflected in the Class I and blend price differentials." 1958 H.R. 1264–65.

The reasons that these differentials existed, according to Dr. Swonger, were the availability of alternative marketing

---

10. If the *Blair* court's definition of market differentials were followed, it necessarily would mean that the double set of minimum prices upheld in *Green Val-* *ley Creamery* and cited with approval by the Supreme Court in Brannan v. Stark, 342 U.S. 451 (1952), also would be invalid. See supra note 9.

opportunities to nearby producers, greater evenness of production in the nearby area, historical pricing patterns, and the need for alignment with the various neighboring, competing New England and Middle Atlantic markets. 1958 H.R. 1962–65. In addition, as pointed out by George C. Dudley, a dairy farmer and chairman of the dairy commodity committee of the Connecticut Farm Bureau Association, Connecticut farmers had higher taxes and other costs. 1958 H.R. 554.

After presenting a number of exhibits showing the historic price differential paid in the Connecticut market, Dr. Swonger stated:

"These exhibits bear out the fact that producers located near the market have been able to obtain prices for their milk higher than could be explained solely on the basis of handling and transportation costs. The differentials have probably been wider than can be maintained under present marketing conditions. . There may be groups in Northern New England or New York who will argue for 'no differential' in excess of handling and transportation costs, and other groups in southern New England who will argue that the differentials have not been high enough. We say merely that a substantial differential has existed, and that this fact has .to be recognized under any federal order." 1958 H.R. 1267–68.

It is relevant in considering Dr. Swonger's testimony that he did not simply propose farm location differentials in isolation but as part of an integral plan designed to achieve equitable results for all producers.

Dr. Swonger did not feel qualified to testify with respect to the "specific definition of the differential areas." As he stated:

"Such testimony must come from those in Connecticut who are more familiar with the nearby supply area and the relative prices paid to producers. The definition of the differential areas

depends not on political boundaries, but on the competitive pressure of other markets seeking milk in the same area. In general, the boundaries should be drawn in such a way as to affect the fewest number of neighboring producers, in much the same way as the boundaries of a marketing area are defined to 'minimize competition' between regulated and unregulated handlers." 1958 H.R. 1268–69.

Testimony as to what the specific differential areas should be was provided by Fred S. Raymond, Director of the Cooperative Dairy Economic Service (1958 H.R. 623–32), Kenneth E. Geyer, General Manager of the Connecticut Milk Producers Association, and others. Mr. Geyer testified that "the Hudson River and the Massachusetts Turnpike and its New York extension" would be proper boundaries "closely conform[ing] to the Connecticut direct delivery milkshed area." 1958 H.R. 1312. The direct delivery milkshed area is that area from which milk is delivered directly to Connecticut handlers rather than to plants outside of the state from where the milk must be transshipped. Not only Mr. Geyer but the other witnesses analyzed the differential in terms of nearby direct delivery areas.

The Secretary's 1959 Final Decision affirmed the need for farm location differentials on the basis of the prior hearing, making certain changes in the areas covered by the proposed differentials so that they would conform to what had been suggested by the witnesses. 24 Fed. Reg. 1049, 1063 (1959). The differentials as modified were included in the first federal Connecticut order promulgated at the time of this Final Decision. The differentials were reviewed at hearings held in 1959 and 1963 and reaffirmed in 1960 and 1964 on the original basis.

The Court is completely satisfied that the Secretary's finding that the differentials were customarily paid is supported by substantial evidence. Therefore, the differentials are authorized by

the Act as market differentials customarily paid and are not unconstitutionally discriminatory. Furthermore, substantial evidence supports the Secretary's findings that the employment of the differentials "will tend to promote orderly marketing in the milkshed." Id. The differentials are therefore a valid provision of the Connecticut order. Section 8c(4) of the Act.

## CONCLUSION

The Court concludes that this action presents a justiciable controversy over which the Court has jurisdiction. Plaintiffs and defendant-interveners are properly representative of the classes of dairy farmers previously designated by the Court.

The Court further concludes that the farm location differentials in the Connecticut Milk Marketing Order, 7 C.F.R. § 1015.72 (1968), are authorized by Section 8c(5)(B) of the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 608c(5)(B), and are otherwise legal and valid provisions of that Order. Therefore the Court denies a permanent injunction enjoining the Secretary of Agriculture from continuing the differentials and directs that judgment be entered in favor of defendant and defendant-interveners.

This Memorandum of Decision, together with separately stated Findings of Fact and Conclusions of Law, constitute the Court's findings of fact and conclusions of law pursuant to Rule 52, Fed.R. Civ.P.

Plaintiffs' motions to strike evidence, including renewal of motions made at the trial and motions which they were granted leave to file subsequent to trial, have been carefully considered. The Court denies the motions insofar as they are directed at evidence which supports the Court's findings of fact and conclusions of law made herein pursuant to Rule 52, Fed.R.Civ.P.; in all other respects, the motions are dismissed as moot.

Since this is a class action and judgment therefore will bind all members of plaintiffs' class, the Court deems it advisable to direct the Clerk to delay entry of judgment in favor of defendant and defendant-interveners for a period of fifteen days and to direct that within that period plaintiffs' counsel shall mail to all members of plaintiffs' class notice of the Court's decision, together with an explanation of the effect thereof and a statement as to whether plaintiffs intend to prosecute an appeal. If plaintiffs do not intend to prosecute an appeal, notice must be given of the means by which members of the class may seek leave to file such an appeal and the time limit involved.

Furthermore, since this is an action for an injunction, entry of judgment automatically and immediately will terminate the preliminary injunction granted by order of this Court, Foley, C. J., on March 9, 1967, unless the Court directs otherwise. Rule 62(a), Fed.R.Civ.P. Therefore, in order fully to protect the rights of all parties and to maintain the status quo to permit an appeal, the Court orders that the preliminary injunction granted on March 9, 1967 shall continue in force until entry of judgment and thereafter for a period of sixty days upon such terms and conditions as contained in the order of March 9, 1967, unless otherwise directed by the Court. If within sixty days a notice of appeal is filed, the preliminary injunction shall continue in force during the pendency of the appeal unless dissolved or modified by the appropriate court.

## ORDER

ORDERED as follows:

(1) That the Court's orders of October 20, 1967 with respect to maintenance of this action as a class action by plaintiffs and defendant-interveners are affirmed in all respects, except that Roy E. Ottman and George Mesick, Jr. are eliminated as named plaintiffs.

(2) That all motions to strike evidence, insofar as they are directed at evidence which supports the Court's findings of fact and conclusions of law herein pursuant to

Rule 52, Fed.R.Civ.P., are denied; in all other respects, the motions to strike evidence are dismissed as moot.

(3) That upon the expiration of fifteen days the Clerk shall enter final judgment in favor of defendant and defendant-interveners dismissing plaintiffs' complaint with costs.

(4) That plaintiffs' counsel within fifteen days shall mail to each member of plaintiffs' class a notice of this Court's decision herein, together with an explanation thereof and a statement as to whether plaintiffs will prosecute an appeal. In the event that plaintiffs do not intend to appeal, notice must also be given as to the means by which members of plaintiffs' class may seek leave to file such an appeal and the time limit involved.

(5) That the preliminary injunction granted pursuant to an order of this Court dated March 9, 1967 shall continue in effect until entry of judgment and thereafter for a period of sixty days under such terms and conditions as contained in the Court's order of March 9, 1967, unless the Court directs otherwise.

(6) That if a notice of appeal is filed in this action within sixty days after entry of judgment, the preliminary injunction granted on March 9, 1967 shall continue thereafter during the pendency of the appeal subject to dissolution or modification at any time by the appropriate court.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, after full hearing, makes the following Findings of Fact and Conclusions of Law which, together with the Court's Memorandum of Decision filed herein, constitute the Court's findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.

## FINDINGS OF FACT

1. Plaintiffs are four dairy farmers (milk producers) located in New York State. They bring this action individually, and as representatives of the class of approximately 250 milk producers who do not receive "farm location differentials" pursuant to Section 1015.72(a) of the Connecticut Milk Marketing Order regulating the handling of milk in the Connecticut milk marketing area, 7 C.F. R. § 1015 (1968).

2. Three other dairy farmers located in Connecticut and Massachusetts were permitted to intervene as defendants on behalf of themselves as individuals, and as representatives of the class of approximately 3000 milk producers receiving farm location differentials pursuant to Section 1015.72(a) of the Connecticut Marketing Order.

3. Plaintiff Cranston for eight years has been opposed to the Connecticut farm location differentials. In 1966, Cranston discussed with his long-time friend and neighbor, attorney John P. Weatherwax, the possibility of bringing legal proceedings to challenge the differentials. On January 27, 1967, after Cranston, French and Carlson definitely had decided to commence an action, Cranston was informed by the Consolidated Milk Producers' Association (CMPA), formerly Connecticut Milk Producers' Association, that CMPA would reimburse members for reasonable expenses incurred in maintaining or defending an action involving the validity of the farm location differentials. CMPA, a democratic organization, was motivated by the fact that its members included both those who did, and those who did not, receive the differentials and by the fact that great uncertainty surrounded the differentials. Cranston informed CMPA that he had his own attorney, Mr. Weatherwax. The Association official told Cranston that he would like to check the attorney out as to his reputation since the Association was concerned that both sides should be well represented by competent attorneys. CMPA's official position favors the dif-

ferentials, and a majority of its members receive them. CMPA's counsel represents defendant-interveners. CMPA officials, plaintiffs, and plaintiffs' attorney met once prior to the commencement of this action.

4. Neither defendant nor defendants' counsel knew that this action would be instituted prior to its actual institution, nor did they have any contact with plaintiffs or plaintiffs' counsel prior to the institution of this action.

5. CMPA at no time has influenced, attempted to influence or in any way affected or controlled plaintiffs' conduct of this action. Nor have defendant-interveners or defendant attempted to exercise control over or to influence plaintiffs' conduct of this suit.

6. Plaintiffs and defendant-interveners faithfully, earnestly and forthrightly have represented the interests of their respective classes. The attorneys for each class likewise have acted in a thoroughly professional and expert manner. The entire record indicates that this action has been conducted as an adversary proceeding on the highest level. In short, plaintiffs and defendant-interveners have represented the members of their respective clasess fairly and adequately.

7. The complaint, filed on February 9, 1967, alleges the invalidity, on several grounds, of certain farm location differentials included by the Secretary of Agriculture in the Connecticut Milk Marketing Order under the authority of the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601, et seq.

8. The challenged provision results in producers whose farms are located in two specified geographical areas receiving a differential over and above the uniform price for milk, of 46¢ and 23¢ per hundredweight, respectively, for their milk which is priced under the Order, depending upon the designated area in which their farms are located. The Order describes the marketing area as follows:

"§ 1015.2 Connecticut marketing area.

'Connecticut marketing area', referred to in this part as the 'marketing area', means all territory within the State of Connecticut, together with all waterfront facilities connected therewith and craft moored thereat, and all territory therein occupied by government (municipal, State or Federal) installations, institutions or other establishments."

The Order sets forth the provisions relating to the farm location differentials, including the areas affected, as follows:

"§ 1015.72 Farm location differentials.

(a) In making payments to producers for milk received from a farm located in Connecticut, Rhode Island, in that portion of New York State east of the Hudson River and south of the Berkshire Section of the New York State Thruway, or in that portion of Massachusetts south of the Massachusetts Turnpike, there shall be added 46 cents per hundredweight.

(b) In making payments to producers for milk received from a farm located outside the area described in paragraph (a) of this section, but within that portion of New York State east of the Hudson River and south of the northern boundaries of North Greenbush, Sand Lake, and Stephentown townships in Rensselaer County, and within that portion of Berkshire County, Massachusetts north of the Massachusetts Turnpike, there shall be added 23 cents per hundredweight."

9. In accordance with the provisions of the Act, the Secretary of Agriculture promulgated the Connecticut Milk Marketing Order, including the challenged provision, partially effective on March 1, 1959, and fully effective April 1, 1959, following notice, public hearing, findings based on the evidence introduced at the hearing, and a favorable referendum among producers supplying the proposed marketing area.

10. The Final Decision published by the Secretary incident to the promulgation of the Order on February 11, 1959,

discloses that the Secretary included the "farm location differential" provisions under his authority to make adjustments to the uniform producer price contained in Section 608c(5)(B)(ii) of the Act as an adjustment for "market differentials customarily applied by handlers."

11. The Secretary of Agriculture, in subsequent findings based on evidence adduced at subsequent public hearings, reaffirmed and rejustified his original findings of February 1959, with respect to the economic necessity for and the validity of the "farm location differential" provisions in the Connecticut Milk Marketing Order.

12. Where the circumstances warranted it, the Secretary of Agriculture has included provisions in other marketing orders for preferential payments to producers based solely on the location of their farms nearby the market.

13. Federal price regulation of milk was first authorized by the Agricultural Adjustment Act of 1933. This Act provided for marketing agreements and for the issuance of licenses by the Secretary of Agriculture regulating the pricing of milk to producers by handlers. Pursuant to this authority, the Secretary of Agriculture issued many licenses regulating the handling and pricing of milk throughout the United States in the areas described in the licenses.

14. Among the stated purposes of the amendments in 1935 to the Agricultural Adjustment Act, as they affected milk, were those which were designed to reinforce the existing practices of cooperative associations and to carry forward the methods employed under licenses issued pursuant to the 1933 Act. They were also intended to adopt the present practices of business. These amendments, among others, provided for the adjustments to the uniform producer price for "volume, market and production differentials customarily applied by handlers."

15. Prior to 1933, cooperative associations, as a part of their voluntary methods of pricing milk to producers, gave preferential treatment to nearby producers. This practice also was reflected in the licenses issued under the Agricultural Adjustment Act of 1933. The practice of giving preferential price treatment to producers whose farms were located nearby the market was carried over in some orders issued following the 1935 amendments.

16. The Agricultural Marketing Agreement Act of 1937, re-enacted the provisions, as they affected milk marketing orders, of the 1935 amendments to the Agricultural Adjustment Act. Section 4 of the 1937 Act expressly validated existing orders, regulations issued pursuant thereto, and the acts of the Secretary in connection with licenses and orders issued under the AAA. The Conference Committee Report incident to the amendatory legislation expressly stated that Section 4 was to remove all doubts about the validity of actions of the Secretary as reflected in existing orders.

17. The draftsman of the language of Section 608c(5)(B)(ii) considered the terms "volume, market and production differentials customarily applied by handlers" as embracing the existing practices of cooperatives and the existing methods of licenses which gave recognition to many and varied differentials which could be described as associated with the words "volume", "marketing" and "production" practices.

18. There were in existence in the various marketing areas in 1935 many different differentials which could be described as based upon or associated with "volume", "market", and "production".

19. The language in the Committee reports dealing with marketing orders which accompanied the AAA of 1935, when read in its entirety, discloses that, in order to reinforce the many and varied existing practices of cooperative associations and the methods employed in licenses in pricing producer milk, the words "volume", "market", and "production", as used to describe differentials in Section 608c(5)(B)(ii), were descriptive of types of differentials.

20. Among the existing differentials practiced by cooperatives and employed in licenses were those which gave preferential price treatment to producers based upon the location of their farms nearby the market. This type of differential is within the category of "market differentials customarily applied by handlers".

21. There has been no showing by plaintiffs that the differentials established by Section 1015.72(a) and (b) prohibit the movement of their milk into the Connecticut marketing area or that such differentials otherwise constitute a "trade barrier" within the meaning of Section 608c(5)(G) of the Act.

22. The administrative record contains substantial evidence to justify the Secretary's promulgation of a nearby differential in the Connecticut Milk Marketing Order.

## CONCLUSIONS OF LAW

1. This is an adversary action presenting justiciable issues over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331(a), 1337, 2201–02, 5 U.S. C. §§ 701–06 and 7 U.S.C. § 601, et seq.

Venue is properly laid in this District pursuant to 28 U.S.C. § 1391(e).

2. This is a proper class action pursuant to Rule 23(a) and (b)(1)(B), Fed.R.Civ.P., with respect to plaintiffs' and defendant-interveners' classes as set forth in this Court's orders of October 20, 1967.

3. The farm location differentials contained in Sections 1015.72(a) and (b) of the Connecticut Milk Marketing Order, 7 C.F.R. § 1015 (1968), are market differentials customarily paid by handlers subject to the Order and as such are authorized pursuant to Section 608c (5)(B) of the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C. § 601, et seq.

4. The farm location differentials are not "trade barriers" and do not violate Section 608c(5)(G) of the Act.

5. The farm location differentials are not unconstitutionally discriminatory.

6. The Secretary's findings with respect to the inclusion of the farm location differentials in the Connecticut Order are supported by substantial evidence in the administrative record.

## MEMORANDUM ORDER
## ON
## MOTION TO DISQUALIFY A JUDGE BY AN APPLICANT SEEKING TO INTERVENE
### JULY 26, 1968.

A motion having been filed on July 17, 1968, pursuant to 28 U.S.C. § 144, to disqualify the undersigned judge from proceeding further herein; and

It appearing that the motion to disqualify purports to be supported by an affidavit made by one Kenneth Hewitt who is not a party to this proceeding but merely an applicant seeking to intervene; and

It further appearing that the certificate of counsel signed by one Charles P. Ryan, Esq., of Washington, D. C., asserting that the motion and affidavit are made in good faith, is not a certificate of counsel of record, said attorney Ryan being neither a member of the bar of this Court nor counsel of record, and no certificate of good faith having been made by applicant's counsel of record, Sanford Rosenblum, Esq., who is a member of the bar of this Court; and

It further appearing that the trial of this case began on August 10, 1967 and the instant motion to disqualify was filed more than eleven months later, on July 17, 1968; and

 The undersigned being of the opinion that the said motion to disqualify should be denied as utterly frivolous, for the reasons

(1) That the said motion is not made by, nor is it supported by an affidavit by, a *party* to this proceeding as required by 28 U.S.C. § 144.

(2) That the said motion is not accompanied by a certificate of good faith by *counsel of record* as required by 28 U.S.C. § 144.

(3) That the said motion is not *timely*, having been filed more than eleven months after the trial began rather than ten days before the beginning of the term at which the proceeding was to be heard as required by 28 U.S.C. § 144.

(4) That—even assuming (contrary to fact) that the motion was timely, that it was made by and supported by an affidavit by a party to the proceeding, and that it was accompanied by a certificate of good faith by counsel of record—the affidavit in support of the instant motion is insufficient as a matter of law to show the personal bias or prejudice required for disqualification under the statute, because

(a) Solely for the purposes of the instant motion, pursuant to 28 U.S.C. § 144, the facts alleged in the affidavit in support of the motion to disqualify have been taken as true; the inquiry is confined to their legal sufficiency. Berger v. United States, 255 U.S. 22 (1921); Rosen v. Sugarman, 357 F.2d 794, 797 (2 Cir. 1966).

(b) To be sufficient, an affidavit must show personal bias or prejudice on the part of the judge in the sense of giving "fair support to the charge of a bent of mind that may prevent or impede impartiality". Berger v. United States, supra, at 33–34; Rosen v. Sugarman, supra, at 798. Put another way, an affidavit of prejudice to be sufficient must state with particularity facts which "would fairly convince a sane and reasonable mind that the judge does in fact harbor the personal bias or prejudice contemplated by the statute". United States v. Hanrahan, 248 F.Supp. 471, 475 (D.D.C.1965).

(c) Disqualification is warranted and appropriate only if the alleged bias and prejudice stems from an extrajudicial source and has resulted in the formulation of an opinion on the merits not based upon what the judge has learned by his participation in the proceedings before him. United States v. Grinnell Corp., 384 U.S. 563, 583 (1966).

(d) The affidavit in support of the motion to disqualify in the instant case shows at most that legal rulings by the judge during the course of proceedings herein have incurred the displeasure of an applicant seeking leave to intervene, as well as the displeasure of his counsel who is neither a member of the bar of this Court nor counsel of record herein. United States v. Devlin, 284 F.Supp. 477, 481–82 (D.Conn.1968); United States v. Richmond, 178 F.Supp. 44, 46 (D.Conn.1958) (opinion by J. Joseph Smith, D. J.); United States v. Valenti, 120 F.Supp. 80, 84 (D.N.J. 1954).

(e) The affidavit in support of the instant motion being legally insufficient, disqualification would be improper. A judge is duty-bound not to disqualify himself upon insufficient grounds. Only in this way can the Court safeguard itself from such a frivolous attack as has been here attempted. Rosen v. Sugarman, supra; United States v. Devlin, supra, at 482; United States v. Richmond, supra, at 48; In re Union Leader Corp., 292 F.2d 381, 391 (1 Cir.), cert. denied, 368 U.S. 927 (1961); Mirra v. United States, 255 F.Supp. 570, 583 (S.D.N.Y. 1966), aff'd, 379 F.2d 782 (2 Cir.), cert. denied, 389 U.S. 1022 (1967); United States v. Hanrahan, supra, at 475; United States v. Valenti, supra, at 83, and cases cited at n. 2.

it is therefore

Ordered that the said motion filed July 17, 1968, pursuant to 28 U.S.C. § 144, to disqualify the undersigned judge from proceeding further in the above-captioned case be, and the same hereby is, denied as utterly frivolous.